i.e. PIM, are assisting the timer, or as here, are the active participants in the timing scheme.

32.    In addition, fund managers are required to update NAVs at the end of the day in New York when there have been market moves that might render the NAV stale. This is called giving the fund a "fair value," and eliminates the timer's arbitrage. As fiduciaries for their funds, they are obligated to use their best efforts to employ these available tools to protect their customers from the dilution that timing causes.

## FACTUAL BACKGROUND

33.    Aided by the Putnam Manager Defendants, the Putnam Fiduciary Defendants and John Does 51-100 perpetrated two primary manipulative schemes on the Putnam Funds. The schemes, which had started by at least the year 1998 and were known by the Putnam Manager Defendants by at least year 2000, violated the Investment Advisor's and Fund Manager's fiduciary duties to the funds. These schemes gained the Putnam Funds' managers substantial fees and other income for themselves and their affiliates, in addition to the substantial profits that were made by the Putnam Fiduciary Defendants and John Does 51-100 by engaging in these acts. All such profits were made at the expense of Putnam Funds shareholders.

34.    PIM is the manager and investment advisor for all of the Putnam Funds. While each mutual fund is in fact its own company, as a practical matter PIM ran all of the business of the Funds. Portfolio managers are all typically employees of a mutual fund advisor entity (who hold office by election of the Trustees), not the mutual funds themselves. The advisor, in this case PIM, makes its profit from fees it charges the funds for financial advice and other services. Such fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money PIM makes.

35.     In what has unfortunately become a common mutual fund industry practice,[3] the timer frequently offers the fund manager/advisor more assets in exchange for the right to time. In return, fund managers (here PIM) allow timers (e.g., a hedge fund) to target specific funds (e.g., the Putnam International New Opportunities Fund) which would be hurt in exchange for additional money in the managers own pockets in the form of higher management fees resulting from the timers placing of assets (sometimes called "sticky funds") in other funds offered by the mutual fund company (here Putnam).

36.     Putnam, PIM and the Putnam Fiduciary Defendants, were direct perpetrators, participants, and beneficiaries of the wrongdoing alleged herein. In some instances, the Putnam Fiduciary Defendants obtained assistance to engage in late trading directly from PIM. In other instances, Putnam Fiduciary Defendants did not require assistance as they, themselves, were responsible for the management and administration of the Putnam Funds, including the entry and execution of trades in Putnam Funds. By and through their authority, access, and control over the Putnam Funds, the Putnam Fiduciary Defendants engaged in late trading and market timing in the Putnam Funds for their own benefit at the expense of the Putnam Funds. By failing to enforce and/or follow regulations prohibiting late trading, PIM allowed, encouraged, and facilitated the Putnam Fiduciary Defendants to buy and sell Putnam Funds, the very funds that Defendants and their co-conspirators had the fiduciary duty to oversee and protect from such malfeasance, at the 4:00 p.m. price far beyond the 4:00 p.m. deadline. Moreover, PIM allowed, encouraged, and facilitated the Putnam Fiduciary Defendants to engage in rapid short term

---

[3] See Complaint, *State of New York v. Canary Capital Partners, et al.* (Supr. Ct. of N.Y., Sept. 3, 2003).

trading of the Putnam Funds in violation of rules and policies set forth in the prospectus for each Putnam Fund and in breach of the fiduciary duties owed to the Putnam Funds. This conduct continued for years and was well known within PIM and amongst the fiduciaries responsible for the management of Putnam Funds.

37. Meanwhile, the Putnam Funds publicly maintained a policy that prohibited excessive trading. For example, the fund share exchange policy described in the Prospectus Supplement for the Putnam International New Opportunities Fund, dated September 22, 2003, states:

> The fund imposes a redemption fee of 1.00% of the total redemption amount (calculated at market value) if you sell or exchange your shares after holding them for less than 90 days. The redemption fee is paid directly to the fund, and is designed to offset brokerage commissions, market impact, and other costs associated with short-term trading.
>
> \* \* \*
>
> The exchange privilege is not intended as a vehicle for short-term trading. Excessive exchange activity may interfere with portfolio management and have an adverse effect on all shareholders. In order to limit excessive exchange activity and otherwise to promote the best interests of the fund, the fund imposes a redemption fee of 1.00% of the total exchange amount (calculated at market value) on exchanges of shares held less than 90 days. The fund also reserves the right to revise or terminate the exchange privilege, limit the amount or number of exchanges or reject any exchange. The fund into which you would like to exchange may also reject your exchange. These actions may apply to all shareholders or only to those shareholders whose exchanges Putnam Management determines are likely to have a negative effect on the fund or other Putnam funds.

Virtually identical language was contained in prospectuses for other Putnam Funds.

38. Despite such policies and in violation of their fiduciary duties, the Putnam Manager Defendants knowingly, deceptively permitted, and actively facilitated the Putnam Fiduciary Defendants' and John Does 51-100 market timing, by engaging in such self-dealing activity and by continuing such relationships with offending individuals to allow them to conduct

15

late trading and/or market timing on the Putnam Funds to the detriment of the Putnam Funds.

39. The Putnam Fiduciary Defendants and John Does 51-100 realized significant profits as a result of these timing arrangements at the expense of the Putnam Funds. In many cases these profits also reflect late trading, as the Defendants would frequently negotiate a timing agreement with a mutual fund management company/advisor and then proceed to late trade the target funds through intermediaries.

40. As a result of the investigation by the Securities Division of the Secretary of the Commonwealth of Massachusetts, PIM announced on October 24, 2003, that it had terminated four money managers because they engaged in market timing trades of Putnam funds for their personal accounts. This termination occurred some three years after the Putnam Manager Defendants became aware of the conduct.

41. On October 28, 2003, the SEC and the Commonwealth of Massachusetts filed civil lawsuits against defendants PIM, Scott, and Karnshad. The complaints allege that the individual Defendants used nonpublic information about their funds' holdings to profit personally from market timing as far back as 1998 and continued through March of 2003. Moreover, the complaints allege that PIM engaged in securities fraud by failing to disclose to fund shareholders the market timing acts and to take adequate steps to prevent Scott, Kamshad, and John Does 1-50 from engaging in market timing. Allegations that the scheme continued until March, 2003, contradict Putnam's statements that it had stopped the market timing activity in 2000. The SEC continues to investigate Putnam.

42. These events have had and will have a series of deleterious effects on the Putnam family of funds, including but not limited to:

    (a) Loss of confidence of the investing public in the integrity and

16

management of the Putnam Funds, thereby resulting in the Putnam Funds losing NAV and market value.

(b)     As a result of Defendants' misconduct, the Putnam Funds are exposed to significant regulatory scrutiny and to suit by investors for losses resulting from Defendants' misconduct, thereby, at a minimum, causing the Putnam Funds to incur unnecessary direct and indirect investigatory, litigation, and administrative costs, and potentially resulting in awards, judgments, or settlements against the Putnam Funds.

## DEMAND EXCUSED ALLEGATIONS

43.    The Plaintiff has not made demand upon the trustees of the Trust or the directors of Putnam to bring an action against the Putnam Defendants and other culpable parties to remedy such wrongdoing.

(a)    Demand is excused because no such demand is required for the Plaintiff to assert a federal claim under Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in connection with the compensation and other payments paid to Putnam.

(b)    Demand is also excused because the unlawful acts and practices alleged herein are not subject to the protection of any business judgment rule and could not be ratified, approved, or condoned by disinterested and informed directors under any circumstances.

(c)    Demand is also excused because the unlawful acts and practices alleged herein involve self-dealing on the part of the Putnam Manager Defendants and its directors and officers who manage and control the day-to-day affairs of the Trust and the Putnam Funds.

(d)    Demand upon the Trustees is also excused because the Trustees of the Trust are all hand-picked by Putnam management and thus owe their positions as well as their

17

loyalties solely to Putnam management and lack sufficient independence to exercise business judgment. Because the Trust oversees eighteen separate funds, the Trustees derive substantial revenue and other benefits for their services.

(e) Finally, demand is excused because such demand would be futile. The unlawful acts and practices alleged herein have been the subject of an intense investigation which resulted in civil charges by the Securities Division of the Secretary of the Commonwealth of Massachusetts.[4] Consequently, Putnam already has been informed of the wrongdoing alleged herein and has failed and refused to take appropriate action to recover damages for the Putnam Funds. Moreover, Putnam's lackadaisical response is clearly insufficient and demonstrative of the conflicts and true allegiances of the Trustees of the Trust. In announcing the termination of four fund managers because of their involvement in the conduct under investigation by the Commonwealth of Massachusetts, Putnam acknowledged that it had been aware of the unlawful conduct since 2000, yet took no disciplinary action against the offenders and has done nothing to stop or correct it. In fact, Putnam allowed the offenders to keep the profits they had made from market timing at the expense of shareholders. Moreover, Putnam misled the public by claiming that it had stopped such activity at the time of discovery when in fact the illicit activity continued into 2003. By failing to take action before the Commonwealth of Massachusetts investigation the directors of Putnam acquiesced in or condoned such conduct. No shareholder demand would reasonably have caused them to change their complicit disregard for the wrongdoing,

---

[4] *See Sec. and Exch. Comm'n v. Scott, et al.*, 03-CV-12082 (D. Mass. filed Oct. 28, 2003).

## COUNT I

**Violation Of Section 36 Of The Investment Company Act And For
Control Personal Liability Under The Investment Company Act
(Against the Putnam Manager Defendants and the Putnam Trustees)**

44. Plaintiff incorporates by reference all paragraphs above as if set forth herein.

45. Pursuant to Section 36 of the Investment Company Act, 15 U.S.C. § 80a-35(b), the investment advisor of a mutual fund owes to the mutual fund and its shareholders a fiduciary duty with respect to its receipt of compensation for services or payments of any material nature, paid by the mutual fund or its shareholders to such investment advisor or any affiliated person.

46. Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C, § 80a-35(b), a civil action may be brought by a mutual fund shareholder against an investment advisor or any affiliated person who has breached his/her or its fiduciary duty concerning such compensation or other payments.

47. As alleged above in this Complaint, each Putnam Manager Defendant and each Trustee breached his/her or its fiduciary duty with respect to the receipt of compensation or other payments from the Putnam Funds or their shareholders.

48. By agreeing and/or conspiring amongst themselves and with John Does 51-100 to permit and/or encourage the Putnam Fiduciary Defendants and John Does 51-100 to time the Putnam Funds, the Putnam Defendants placed their own self-interest in maximizing their compensation and other payments over the interest of the Putnam Funds and its shareholders.

49. By virtue of the foregoing, the Putnam Manager Defendants and the Putnam Trustees have violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

50. As a direct and proximate result of the Putnam Defendants' wrongful conduct, the assets and value (including the NAV) of the Putnam Funds have been reduced and diminished

and the corporate assets of the Putnam Funds have been wasted and the Putnam Defendants and the Trustees are liable.

## COUNT II

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against the Putnam Manager Defendants)

51. Plaintiff incorporates by reference all paragraphs above as if set forth herein.

52. Putnam acted as a controlling person of PIM within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of PIM being a wholly-owned subsidiary of Putnam and Putnam's active participation in and/or awareness of PIM's day-to-day operations, Putnam had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of PIM. Putnam had unlimited access to PIM's records of transactions and had the ability to prevent PIM from engaging in the schemes and artifices to defraud complained of in this Complaint.

53. Putnam had direct and supervisory involvement over the day-to-day operations of PIM and, therefore, is presumed to have had and did have the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

54. By virtue of its position as a controlling person, Putnam is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, the Putnam Funds suffered damages in connection with the acts and practices alleged in this Complaint.

20

## COUNT III

### Common Law Breach Of Fiduciary Duty
### (Against the Putnam Manager and the Putnam Defendants)

55. Plaintiff incorporates by reference all paragraphs above as if set forth herein.

56. The Putnam Manager Defendants and the Putnam Trustee Defendants and each of them owed to thePutnam International New Opportunities Fund, the Putnam Funds and their shareholders the duty to exercise due care, diligence, honesty, and loyalty in the management and administration of the affairs of each Putnam Fund and in the use and preservation of its property and assets, and owed the duty of full and candid disclosure of all material facts thereto. Further, said Defendants owed a duty to the Putnam Funds and their shareholders not to waste the funds' corporate assets and not to place their own personal self-interest above the best interest of the funds and their shareholders.

57. To discharge those duties, the Putnam Defendants and the Trustee Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Putnam Funds.

58. As alleged above, each of said Defendants breached his/her or its fiduciary duty by receiving excessive compensation or payments in connection with the timing scheme and other manipulative schemes as alleged in this Complaint.

59. As alleged above, each of said Defendants also breached his/her or its fiduciary duty to preserve and not to waste the assets of the Putnam Funds by permitting or incurring excess charges and expenses to the funds in connection with the timing scheme and other manipulative schemes as alleged in this Complaint.

21

## COUNT IV

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against John Does 51-100)

60.	Plaintiff incorporates by reference all paragraphs above as if set forth herein.

61.	John Does 51-100 knew of the existence of the fiduciary duty between the Putnam Defendants, the Trustee Defendants and the Putnam Funds and knew the extent of that duty. John Does 51-100 knew of the acts of late trading and timing made by them on the Putnam Funds and knew that these acts and manipulative devices were a breach of the fiduciary duties the Putnam Defendants and the Trustee Defendants owed to the Putnam Funds. John Does 51-100 maliciously, without justification and through unlawful means, aided, abetted and conspired with the Putnam Defendants and the Trustee Defendants in breaching their fiduciary duties and provided substantial assistance and encouragement to the Putnam Defendants and the Trustee Defendants in violating their fiduciary duties in the manner and by the actions described in this Complaint.

62.	John Does 51-100 are jointly and severally liable to the Putnam Funds for damages proximately caused by their aiding and abetting as alleged herein.

63.	As a direct and proximate result of Defendants' wrongful conduct the assets and value (including the NAV) of the Putnam Funds has been reduced, diminished and the corporate assets of the Putnam Funds have been wasted.

## COUNT V

### CIVIL CONSPIRACY
(Against the Putnam Manager Defendants, PIM, and John Does 1-100)

64.	Plaintiff incorporates by reference all paragraphs above as if set forth herein.

22

65. The Putnam Defendants, PIM, and John Does 1-100 entered into an agreement or agreements or combinations with each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of an agreement and combination.

66. The Putnam Defendants, PIM, and John Does 1-100 by their actions have manifested actual knowledge that a tortious or illegal act or acts was planned and their intention to aid in such act or acts.

67. The Putnam Defendants, PIM, and John Does 1-100 maliciously and intentionally conspired, combined, and agreed with one another to commit the unlawful acts alleged in this Complaint or to commit acts by unlawful means causing injury to Plaintiff and proximately causing injury and damages to the Plaintiff for which they are jointly and severally liable.

68. The Putnam Funds have suffered damages as a result of the wrongs and the conspiracy to commit such wrongs as alleged in the Complaint in an amount to be proven at trial.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that Court enter judgment as follows:

A. Removing the current Trustees of the Trust and replacing them with independent Trustees;

B. Awarding monetary damages against all of the Defendants, jointly and severally, in favor of the Putnam Funds, for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, including punitive damages where appropriate, together with interest thereon;

C. Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

23

D.  Granting plaintiff such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:

HAGENS BERMAN LLP

By: _____
Thomas M. Sobol, BBO No. 471770
225 Franklin Street, 26th Floor
Boston, MA 02110
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**HAGENS BERMAN, LLP**
Steve W. Berman
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
**Of Counsel**

**SPECTOR, ROSEMAN & KODROFF, P.C.**
Jeffrey L. Kodroff
William G. Caldes
1818 Market Street, Suite 2500
Philadelphia, Pa. 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
**Of Counsel**

**EXHIBIT A**

PUTNAM INVESTMENT FUNDS
PUTNAM AMERICAN GOVERNMENT INCOME FUND
PUTNAM ARIZONA TAX EXEMPT INCOME FUND
PUTNAM ASSET ALLOCATION: BALANCED PORTFOLIO
PUTNAM ASSET ALLOCATION: CONSERVATIVE PORTFOLIO
PUTNAM ASSET ALLOCATION: GROWTH PORTFOLIO
PUTNAM CALIFORNIA TAX EXEMPT INCOME FUND
PUTNAM CAPITAL APPRECIATION FUND
PUTNAM CAPITAL OPPORTUNITIES FUND
PUTNAM CLASSIC EQUITY FUND
PUTNAM CONVERTIBLE INCOME-GROWTH TRUST
PUTNAM DISCOVERY GROWTH FUND
PUTNAM DIVERSIFIED INCOME TRUST
PUTNAM EQUITY INCOME FUND
PUTNAM EUROPE EQUITY FUND
PUTNAM FLORIDA TAX EXEMPT INCOME FUND
PUTNAM FUND FOR GROWTH AND INCOME
GEORGE PUTNAM FUND OF BOSTON
PUTNAM GLOBAL EQUITY FUND
PUTNAM GLOBAL INCOME TRUST
PUTNAM GLOBAL NATURAL RESOURCES FUND
PUTNAM GROWTH OPPORTUNITIES FUND
PUTNAM HEALTH SCIENCES TRUST
PUTNAM HIGH YIELD ADVANTAGE FUND
PUTNAM HIGH YIELD TRUST
PUTNAM INCOME FUND
PUTNAM INTERMEDIATE U.S. GOVERNMENT INCOME FUND
PUTNAM INTERNATIONAL CAPITAL OPPORTUNITIES FUND
PUTNAM INTERNATIONAL EQUITY FUND
PUTNAM INTERNATIONAL GROWTH AND INCOME FUND
PUTNAM INTERNATIONAL NEW OPPORTUNITIES FUND
PUTNAM INVESTORS FUND
PUTNAM MASSACHUSETTS TAX EXEMPT INCOME FUND
PUTNAM MICHIGAN TAX EXEMPT INCOME FUND
PUTNAM MID CAP VALUE FUND
PUTNAM MINNESOTA TAX EXEMPT INCOME FUND
PUTNAM MONEY MARKET FUND
PUTNAM MUNICIPAL INCOME FUND
PUTNAM NEW JERSEY TAX EXEMPT INCOME FUND
PUTNAM NEW OPPORTUNITIES FUND
PUTNAM NEW VALUE FUND, PUTNAM
NEW YORK TAX EXEMPT INCOME FUND

PUTNAM NEW YORK TAX EXEMPT OPPORTUNITIES FUND
PUTNAM OTC & EMERGING GROWTH FUND
PUTNAM OHIO TAX EXEMPT INCOME FUND
PUTNAM PENNSYLVANIA TAX EXEMPT INCOME FUND
PUTNAM RESEARCH FUND
PUTNAM SMALL CAP GROWTH FUND
PUTNAM SMALL CAP VALUE FUND
PUTNAM TAX EXEMPT INCOME FUND
PUTNAM TAX EXEMPT MONEY MARKET FUND
PUTNAM TAX SMART EQUITY FUND
PUTNAM TAX-FREE HIGH YIELD FUND
PUTNAM TAX-FREE INSURED FUND
PUTNAM U.S. GOVERNMENT INCOME TRUST
PUTNAM UTILITIES GROWTH AND INCOME FUND
PUTNAM VISTA FUND
PUTNAM VOYAGER FUND
PUTNAM (INTERNATIONAL) VOYAGER FUND
PUTNAM EUROPE GROWTH FUND